Ms. Mills. Good morning, Your Honors. Allison Mills on behalf of Joseph Osborne. As you know, a jury convicted Osborne of the murder of a child. The only physical evidence at trial of murder was a death mask created by Dr. Stephen Hain, the state's forensic pathologist. The child, in fact, had been found dead in his own bed. Three months later, Hain had the child's body exhumed so that he could create a moulage, that's a plaster cast of the child's face, using what he called the death mask. At trial he testified that a large hand, would favor a male hand, suffocated the child. For years, the legal community believed that Hain was a fraud. There was anecdotal evidence. There were many petitions such as Osborne's filed that relied on the same anecdotal evidence. But courts consistently dismissed those petitions. The courts said anecdotal evidence, unsubstantiated beliefs are not enough. Criminal defense lawyers cross-examined Hain about his qualifications and his opinions. They believed that he testified falsely, but they could not prove it. In 2008, something changed. The Innocence Project, then newly formed in Mississippi, publicly accused Hain of forensic fraud. He, in turn, sued the Innocence Project for defamation. The Innocence Project used that federal lawsuit as an opportunity to finally obtain discovery from and about parties. It engaged a legal fellow to spend a full year, full time, in the Mississippi Department of Archives, reading Dr. Hain's testimony alongside autopsy reports and other such things previously undisclosed by the state. It gathered a lot of facts. And in 2012, the Innocence Project deposed Hain. And that transcript, the transcript of that ultimately led to this petition. And this petition, by the way, attaches the declarations of the Innocence Project's counsel and the legal fellow who attest as to how they obtained the facts on which this petition is based. What are those vital facts? What did the Innocence Project obtain in discovery, use at deposition, and give to Osborne? Number one, the Innocence Project obtained letters to and from the Mississippi Ethics Commission, which showed that it had grave concerns that the state's arrangement with Hain would compromise public health priorities. No one knew about these letters before discovery in the Innocence Project's lawsuit. The Innocence Project learned about them when Hain himself produced one of the letters in discovery, and that prompted their public records request of the Ethics Commission, which produced the other letter. Why would three press releases in the Innocence Project in 2008 have been enough? Well, lots of things, such as the press release, magazine articles, newspaper articles, even a concurring opinion of a Mississippi petitioner's already submitted to courts, and courts said, these are unsubstantiated beliefs. These are not factual predicates. Back to these two letters. We knew that Hain conducted an unconscionable number of autopsies. By his own records, 1,600 in one year alone. Now, the guidelines recommend no more than 250. And we knew that he got paid for each autopsy. It was a fee per autopsy basis. What we did not know is that the state knew, the state knew that this was problematic, but exploited it anyway. The state made his record-breaking number of autopsies further proof of his superpowers as a forensic pathologist. Those two letters were not known to anyone before the Innocence Project obtained them. We did not say that any of those documents were not enough. I'm sorry? We did not say that any of those documents were not enough for a factual predicate. You have not addressed it. No. The district courts that have addressed these issues. The district courts that reviewed relying on these vital facts that I'm describing now. The second thing that the Innocence Project obtained in discovery and gave to Osborne was Hain's ABP exam. That's the American Board of Pathology exam. The legal community knew that Hain was not ABP certified, but he lied about why. He said that he had walked out of the exam because there was a question on the exam regarding the colors of death that insulted his intelligence. In fact, that's not true. The Innocence Project also obtained undergraduate records that showed that Hain also perjured himself in testimony regarding his academic performance. These facts, which did not exist before the Innocence Project obtained these records in discovery, would have been critical to Osborne's case because if Osborne could have shown that Hain perjured himself, he would not have been qualified to testify in any case, including Osborne's. Finally, and I call this a vital fact, but it's really a body of vital facts, the Innocence Project gave to Osborne the body of evidence its legal fellow compiled in that year of research at the Mississippi Department of Archives. And that body of evidence shows that Hain routinely perjured himself by offering testimony that was unscientific and directly contrary to testimony he offered in prior cases. So you take all this together and the needle moves a lot. I mean, whereas before everyone believed he was a fraud, now they could actually prove it. The state concedes that this evidence is at least impeachment evidence. The district court, in its opinion, says that. The district court did not reach the merits of Osborne's claims, however, because it concluded that he should have filed them a long time ago and therefore this petition is untimely. Haven't we already held, actually, in an unpublished case involving Dr. Hain that it was untimely? I would be happy to address that. There are two prior petitions, and I'm familiar with both of them. One filed by a man named Tavares Flags. The other filed by a man named John Ross. Those two prior petitions also relied on this same evidence, which I've been describing as vital facts, this newly discovered evidence. The Innocence Project also gave them the same evidence it gave Osborne. Those two individuals, Flags and Ross, were actually successive filers, whereas Osborne is a first-time filer under AEDPA. They, as successive filers, have a much, much, much higher standard to meet. They have to prove by clear and convincing evidence that, but for constitutional error, the result would have been different. What's that? Jones v. King. I'm not familiar with that, Your Honor. Okay. I'm not aware that Jones v. King relied on the same evidence, but I will address Flags and Ross. In Flags, as a successive flyer, Tavares Flags had to ask this Court for permission to proceed. This Court denied his motion to proceed. It said that he did not state a basis for success on the merits, and in any event, his claims were untimely. That did not, however, preclude the next panel, and Judge Elrod, I believe you were on this panel, from giving Ross permission to proceed on his claims, which are similar to the claims alleged here, but you instructed the district court there to first determine whether it believed his claims were timely. So that case, like this case, went to the district court, and the district court looked at Ross's claims and asked whether they are timely. The district court said no, Ross's claims are untimely, and in any event, he will not succeed on the merits. Ross asked this Court for a COA. This Court denied the COA, but not because this Court concluded his claims were untimely. Not because this Court concluded his claims were untimely. This Court denied Ross a COA because it concluded he could not meet that high standard for a successive filer of proving through clear and convincing evidence that the result would have been different. But it did find that they were timely, either. Right. My point is simply, the issue is open, is my point. The issue is open. Osborne was not aware even of the anecdotal evidence, much less the vital facts, before the Innocence Project shared the information with him. The State does not contend that Osborne had any actual knowledge of the facts underlying his petition. The State argues instead that if the Innocence Project could have unearthed these vital facts in 2012, Osborne should have unearthed them a long, long time ago. The fact is that criminal defense lawyers who were focused on the task could not unearth these facts. And we offer, it's attached to our petition, the declarations of two criminal defense lawyers who tried to unearth these facts, who cross-examined Hain in many cases and had trouble proving that his testimony was false. They could not unearth these facts before 2012. If they could not, how could Osborne? Well, what was it that put the Innocence Project on notice to make an inquiry? I assume they don't just rove around the country and take on, you know, random projects without some reason to think they can be successful. The Innocence Project believed he was a fraud, and they publicly accused him of that. But it wasn't until he sued them that they had the opportunity to actually conduct discovery, and things turned up, and they were successful in proving that he had testified falsely in many cases. And they took that evidence and immediately turned it over to Osborne. So it was the lawsuit, ultimately, that resulted in the discovery of these facts. And when was that filed? I'm sorry? When was the lawsuit? The public accusation was in 2008. The lawsuit was filed in 2009, and they actually deposed Hain in 2012. And that's the date that we say no one, before that date, no one could have known. When did they send it to Osborne? Well, actually, that fact is not in the record. But if you use that date in 2012, it's in May. If that's the date that Osborne was on notice, then his petition is timely. Why isn't the Edmunds concurrence enough by itself to demonstrate the factual predicate of Osborne's claims? Well, I would love for it to have been enough by itself to demonstrate the factual predicate of Osborne's claims. But the fact is that a district court had already held that it was not enough that Justice Diaz's belief that Hain was untruthful was not enough to constitute a factual predicate. For him? For that judge. For? Or for the court. I'm sorry? It wasn't pursued, though, for Osborne. Osborne did not file it because, and this is the trap, Your Honor, and this is the trap that the There's a tension here. On the one hand, you know, for instance, you have this concurring opinion of Justice Diaz. You have a newspaper article, a magazine article. On the one hand, as here, the judge says, well, why didn't you file it when you read the newspaper article? Why didn't you file it when Justice Diaz read his concurring opinion? But if he had, he would have been dismissed just like all the other. We don't know that. Well, we do know. What would have happened on appeal, and we don't know if he was dismissed that he couldn't bring a successive and say it was newly discovered evidence. So we don't know what would have happened had he actually gone through the effort to file when the information was out there in the public. I think it's, respectfully, I think it's asking, you put a petitioner in a bind, because if he sees that other people are being dismissed, he doesn't want to waste his first file on a petition that he expects will be dismissed, because the standards are different. A first file and a second file standard is very different. And we summarize on page 35 of our brief the cases that I'm referring to in which district courts in Mississippi said, this anecdotal evidence simply is not enough. Okay. What do you, do you have any authority to support your argument that the, that newspaper articles cannot trigger the AEDPA limitations period? At least two circuits have gone the other way. Um, my authority, again, is that district courts have dismissed petitioners who tried to rely on the very same newspaper articles. But newspaper articles in general could be triggered, but you're not saying it couldn't. I'm not saying as a general rule, a newspaper article that the defendant himself possessed um, would not trigger, um, no, I'm not saying that, that a, something that is so widely publicized that an incarcerated prisoner is even made aware of it could not trigger notice. It's pretty wildly publicized. Innocence Project sending press releases. There's these articles in national magazines. There's a Supreme Court opinion from the court that issued his opinion, his, his own opinion. This is pretty publicized. Yes, Your Honor. And at the same time, plenty of judges in Mississippi said it's not enough. And at the same time, the state was continuing to defend Hain and saying that everyone else who was targeting him didn't know what they were talking about. I'm out of time. Your, your initial time has expired. You say time for rebuttal. Ms. Owens. Good morning, Your Honors. May it please the Court. I'm Gerilyn Owens on behalf of the Attorney General's Office. With me at council table are Bridget Grant and Aaron Rutherford, also with Special Assistant Attorney General's with our office. I want to first start with your question, Judge Elrod. This, a panel of this court has held that that evidence is not newly discovered, albeit in an unpublished decision, and that was the FLAGS decision. It was granted COA, and they said that the evidence providing the factual predicate is not new. It's this exact same evidence. Hain has been widely and publicly criticized for several years before the deposition, and certainly before the filing of the application. And that was admittedly a successive application, but the due diligence standard applied to 2244 D1D and 2244 B are the same due diligence standard. And it was looking at whether the evidence was newly discovered. And as this court is aware of the question in this case, this case is clearly time barred if we utilize the date that the conviction became final. So the pivotal question is when this evidence could have been discovered through the exercise of due diligence. The district court in this case, I believe, correctly held that it begins on the date they were put on notice of facts which support their claim, not the date that they could discover every scrap of evidence. It's the vital facts underlying the claim that are important as opposed to each individual piece of evidence. And as you correctly pointed out, Your Honor, this information, the district court relied on the fact that this information was out in the public since well before 2008, but he listed the specific pieces of evidence out of the 2200 pages that showed that they could have been put on notice to delve further or to inquire further. The claims in the petition are that the prosecution violated Napoo, violated Brady by withholding evidence, and violated petitioner's right to confrontation clause. But the factual predicate of those claims has to be tethered to those claims. And when you're looking at whether they could have discovered their factual predicate, the question, a good portion of this evidence was dated after the petitioner's trial, so certainly that can't be tethered to a Brady claim of suppression. Counsel, what do you do about the fact that a district court in our circuit said the Edmunds concurrence was insufficient to trigger the Edpa date? I think the concurrence alone, but I think if you look at the other evidence that was out there, and in certain of those cases cited on the appellant's brief, those were cases where we were looking at whether that was enough to find actual innocence, as opposed to trigger the statute of limitations, or enough to find that counsel was ineffective, as opposed to 2241D, question of due diligence. Does the state or the commissioner have a problem because a lot of the documents are not in the record here? You know, a lot of these newspaper articles and things that are discussed in the brief, the Innocence Project letter, all of these, much of these things are not in our record, I don't believe. They were attached as appendices to the original petition. There are over 2,000 pages. So you think they got up here in the Fifth Circuit record somehow? Yes, Your Honor. Okay, well, okay, who's in counsel's agreeing with you that they're in the record? I believe. The appendices. I'm not trying to disrupt your argument. Okay, I just, I mean, I'm pretty sure, I know we had them, so I believe they were. Okay, maybe they just didn't, you know how sometimes things don't always, that are in the record don't make it to the record because. I believe they're at like 2- up to 65. Okay. So the district court in this case took the painstaking task of going through each of those claims to determine whether the factual predicate could be tethered to the claims. And the question of Haines' qualification, he determined that that had been, that was clearly discovered prior to that. The Ethics Commission letter from 1992 was a public letter that, and Judge Verden in the Ross case considered this exact evidence in a successive context, but she also had to make the due diligence determination. And she found what actually was discussed in that Ethics Commission letter never came to fruition because he was never appointed as the state medical examiner. So he was allowed to serve in the position he was in, and he was not required to have the certification that they argue he's required to have as a state medical examiner. And then what the district court found was these questions with regard to him walking out on the APB exam. That's been widely publicized, and he's been cross-examined on those facts. The vital fact that they claimed they could not have discovered was the fact that he was failing the test when he walked out, but the district court said that's just a scrap of evidence. That's exactly what this court found in Flanagan in those cases, but it's just an extra scrap of evidence that would not have made a difference. Case, though, where this is possibly an actual innocence, and it's not freestanding, probably, and that complicates things. This court rejected the actual innocence argument in the COA order. He did argue actual innocence. It's not freestanding in Reese Swearingen. We don't have that. But is it related to Brady or Naipoo or anything? I don't believe any of these are tethered to Brady or Naipoo. When you look at the actual arguments that are made with regard to Brady and Naipoo, any of this mound of evidence that's been amassed. Well, is there a problem with this case, though, that this person might actually be innocent and that he was incarcerated during the time, and so his due diligence standard is lower than a lawyer's? The record showed that the testimony at trial established that originally when the police investigated the case, they believed it was an overdose, an accidental overdose, because the Zyrtec were scattered on the floor. When Dr. Hain received the child's body, he noticed the bruising in the petechiae, and because of the allegation that the child had overdosed on Zyrtec, he took blood samples. And when he did, he determined there was no Zyrtec in the blood system. And he pointed out to the arresting officers that the bruising in the petechiae was indicative of asphyxiation. And ultimately, the younger brother was removed from the home, and he actually alerted his parents, or his relative, to the fact that Joey, who is the defendant, took the life out of Charlie. And he was taken to a forensic examiner, and he described to that forensic examiner how Joey took the life out of his brother by covering his face, the doll's face, with his hand. So Dr. Hain was not the only evidence in this case. The mother testified that she looked at the pill bottle with the Zyrtec, and there was no Zyrtec missing. There was testimony with... Dr. Hain did testify as to an approximate time of death, based on stomach contents. And that is clearly supported by the medical textbooks. And the textbook that they provide, that the Innocence Project provides in this suit was a 2001 textbook, which was clearly available prior to the trial. They could have hired their own expert. They could have questioned Dr. Hain with regard. And they did cross-examine him with regard. But I don't think there is anything to support a claim of actual innocence when you look at the totality of the evidence. The moulage, even though it's considered unusual, Dr. Hain had already determined that there were petechiae and indications of asphyxiation, coupled with the younger brother's statements to relative, coupled with the fact that there were no Zyrtec missing. And so when they... Dr. Hain did not make this cast himself. It was made by an odontologist. And then he took his ruler and the photographs from the autopsy, and they just marked on this moulage where the bruising was to show the size of the hand that would have impacted the face. But the bruising was still evident even when they dug the body up. It was although slight, is what the testimony revealed. So I don't think we're looking at a case where somebody's actually innocent, sitting in jail, and couldn't discover this. And what the district court found was, because of all this widely publicized information, it put them on notice. It's objective standard, and it's a reasonable diligence based on what you were aware of. And Your Honor, I'd also like to point out... Does it matter, though, is incarceration a factor? Based on this court's jurisprudence with regard to other aspects, ignorance of the law is no excuse, or the fact that you're an incarcerated individual. And I think the district court pointed out that he did not believe that his incarceration was a factor. So it is not a factor that we should consider at all, in the totality of factors for due diligence? Or is it a factor, but it's not determinative? What is your position? I would say that it's definitely not determinative. But I think in this case, you look as... He was represented by counsel at the direct appeal. And so the question is, could counsel have known? Because all of this stuff, most of this stuff was available prior to trial. Or could the Innocence Project, who has now stepped in on his... Well, he was tried in 2004, so some of this information was not put out by the Innocence Project until after. But Dr. Hain, in this case, did not even testify to anything regarding his undergraduate record. He didn't testify about the APB exam. There was no... They did not cross-examine him on his qualifications. The only thing he testified to was that he was an appointed state pathologist and that he was an expert in forensic science. So he didn't testify to any of this information. So how can you tether that to a claim that he falsely testified when he didn't testify to that at all in Osborne's case? If he had testified to some of that information, then it might be a different situation, but he did not. But I don't think... I don't think the fact that he's incarcerated in this case made an impact because he had... He was represented by counsel at the trial who had the opportunity to... I don't think you ever answered whether it should be a factor or not. I think you said the district... It certainly could be a factor, but I'm not sure that it is determinative. And I think the district court was clear that, based on Starnes and some of this court's jurisprudence, that the fact that he's incarcerated doesn't change the outcome. And I'd like to just briefly touch on my alternative argument as far as with regard to... I believe the district court was correct in that they cannot show the requisite due diligence for discovering the factual predicate of their arguments and tether those arguments to their claims in the petition. But alternatively, we would submit that the petition would be untimely even if you utilize the date. In this case, the Mississippi Supreme Court denied the application as time-barred. Then petitioner filed a motion for reconsideration. And under pursuant to Mississippi Rule of Appellate Procedure 27-8, they list the types of cases on which you can seek reconsideration in that rule. And reconsideration on an application for post-conviction is not included in that list. The list does include, for good cause shown, suspension of the rules. However, we would submit that doesn't take it out of this court's jurisprudence in Emerson and Luckenbill, those cases where the prisoner has been given some hope that he will have review. It's a very limited list of cases where reconsideration is allowed. So we would submit the time that that application... I mean, the reconsideration was pending would not be counted toward the tolling under 2244-D2. And as such, it would still be untimely even if you were determined that the factual predicate could not have been discovered. But we would ask this court to affirm the district court's findings based on the evidence before him. The district court not only discussed the evidence that was available, but he also discussed Judge Verdon's opinion in Ross where she walked through every single piece of evidence which was the exact same evidence with the exception of evidence specific to Ross's crime about an expert that testified in that case, ballistics information. But the evidence regarding the APB qualifications, the state's arrangement, any of those other... the trial transcripts, autopsy reports, she found in certain instances the evidence was not tethered to this particular case, which would be the same for Osborne's case. And she also found that it was not newly discovered as this court had found in flags and the district court found in this case. All right. Thank you, Ms. Owens. The court has no more questions. I would just ask that you affirm the district court's finding. Thank you. Your Honor, first, there was some argument regarding other testimony in the case. And because we were not invited to brief that, because we're limited here to the question of timeliness, we did not brief that. That goes to the merits and the merits are not before the panel. So I would just like to point out that the fact that our brief doesn't speak to that does not mean that we concede those facts. But to the point, there's no other case of which I'm aware in which the state relied on this moulage death mask. And if we could have established that Hain was a perjurer, he would not have been allowed to present that death mask as the only physical evidence of murder at trial. And you asked Judge Elrod about the due diligence standard applying it to an incarcerated prisoner. And there is plenty of authority that you have to take the prisoner's status as an incarcerated human being into account. We have relied a lot on the case of Jefferson v. United States from the Sixth Circuit to argue the district court's opinion here creates a trap that you can't file too soon, but you can't file too late. Uh-oh, you're out. In that case, the Sixth Circuit observed, we are mindful of the reality of the prison system and are careful not to overestimate the extent to which the average prisoner is able to conduct factual investigations given his incarceration and lack of resources. This court's opinion in Starnes, which both parties cite extensively in their brief, Starnes v. Andrews, 524 F. 3rd, 612, this court says the essential question is not whether the relevant information was known by a large number of people. It's not whether this anecdotal evidence was in the newspaper and the public was aware of it. The question is whether the petitioner should be expected to take actions which would lead him to the information. And you have to bear in mind that the petitioner in this instance, Joey Osborne, was in prison in the East Mississippi Correctional Center in Meridian, Mississippi when the Innocence Project issued that press release in 2008. And that press release just stated the Innocence Project's beliefs. It would not have been sufficient to establish a factual predicate under the rulings of the federal district courts in Mississippi at that time. Anyway, this court in Starnes refers to Easterwood v. Champion, 213 F. 3rd, 1321 from the Tenth Circuit, stating that a prisoner does not fail to act with due diligence when he does not learn of a new case, a new case until it is accessible in the prison law library. So I think it's a given that you have to take the prisoner's status as an incarcerated human being into account when you ask whether he conducted sufficient due diligence such that he did not waive his right to pursue his claim. And the diligence need not be maximum diligence. It need only be due or reasonable diligence. And that's what this court in Starnes v. Andrews held. In that case, actually, the petitioner's parents, civil lawyer in a wrongful death suit was aware of the facts that supplied the factual predicate in his case. The lawyer in his wrongful death lawsuit was aware, but this court held that that clock did not start ticking until he and his criminal lawyer became aware. And I'll just note, opposing counsel began her argument by referring to the Flags decision and said, oh, yes, this court has already held that claims such as these are untimely relying on the same evidence. The Flags decision is the very same Flags decision that I explained in my own argument. That decision was followed by the Ross decision in which this court allowed a petitioner to proceed. Ross ultimately, ultimately his petition was dismissed by Judge Verdon and opposing counsel described Judge Verdon's findings in his case. But again, this court did not affirm Judge Verdon's decision on the basis that her ruling that Ross's claims were untimely was correct. This court has not held that. So this issue is fresh. Thank you. Case is under submission.